KING, C.J.,
 

 for the Court.
 

 ¶ 1. On August 3, 2006, Willie Prater was found guilty of capital murder and sentenced to life in the custody the Mississippi Department of Corrections (MDOC) without the possibility of parole. Aggrieved, Prater appeals arguing the following: (1) the trial court erred in excluding a defense witness; (2) he received ineffective assistance of counsel; (3) the State made inflammatory remarks during closing argument; (4) the trial court erred in allowing opinion testimony about canine olfactory evidence; (5) he was entitled to a lesser-included-offense instruction; (6) the verdict was contrary to the weight of the evidence; (7) his statements made to the Starkville Police Department and Oktib-beha County Sheriffs Department should have been suppressed; and (8) he was not mentally competent to stand trial. Finding no error, we affirm Prater’s conviction and sentence.
 

 FACTS
 

 ¶ 2. At approximately 8:45 a.m. on August 20, 2001, Prater, Devail Hudson, James Paster, Destiny Moore, “Little Mark,”
 
 [1]
 
 Derrick Turner, and Marcus Evans entered the home of seventy-seven-year-old Wynetta Miller (Miller) through the unlocked garage entrance to the house, shortly after her husband, Dalton Miller, left to run daily errands. Prater and his partners in crime ransacked the Millers’ home and carried away personal property and money. After leaving the home, Hudson allegedly returned and set fires in six different locations in the home. Emergency personnel, who arrived at the Millers’ home in response to a call triggered by the smoke alarms, found Miller unconscious with severe head injuries. Later that day, Miller died from these injuries.
 

 ¶ 3. On January 6, 2002, Bentoire Riley went to the Starkville Police Department and confessed to being the lookout man for the men who allegedly robbed and assaulted Miller. Riley testified that on August 20, 2001, he approached a group of men, which included Hudson, “Little Mark,” Paster, Moore, Turner, Evans, and Prater, on the corner near the Millers’ home adjacent to the trailer park where some of the men lived. Riley stated that the men were planning to rob and kill Miller if she caught them in her home. Riley claimed that the men entered the home, took personal property and cash belonging to Miller, exited the home, and scattered. Riley stated that Hudson went back inside the Millers’ home; minutes later, Riley saw smoke coming from the house.'
 

 ¶ 4. On August 20, 2001, Prater was questioned by the Starkville Police Department regarding his involvement in the offense. Prater denied any involvement and was subsequently released. On February 19, 2002, Prater was questioned again by the Starkville Police Department. According to a written statement attributed to Prater, he met Hudson, Riley, Moore, Evans, Paster, Turner, and Joshua Williams
 
 [2]
 
 on the corner and discussed plans to rob the Millers’ home. Prater stated that he agreed to be the lookout man while the other men went inside the house. Allegedly, Prater gave a similar written statement to the Oktibbeha County Sheriffs Department on February 19, 2002. Prater denies
 
 *888
 
 that he made these statements to the authorities.
 

 ¶ 5. In July 2002, an Oktibbeha County grand jury indicted Prater for capital murder. In response to defense counsel’s motion to determine Prater’s competency, the trial court ordered a mental evaluation of Prater on August 2, 2002. The mental evaluation was performed by the Mississippi State Hospital at Whitfield, and a report was filed with the court on March 7, 2003. Dr. Charles Harris and Dr. Reb McMichael stated that their evaluations revealed that Prater was competent to stand trial.
 

 ¶ 6. On February 1, 2005, the morning of trial, as a result of Prater’s disruptive and bizarre behavior before the venire panel during jury selection, the trial court declared a mistrial and ordered Prater to undergo an emergency mental evaluation. In a report filed on May 11, 2005, Drs. McMichael, John Montgomery, and Paul Deal were divided in their opinions as to Prater’s competency to stand trial. As a result, the trial court ordered Prater to be retained for additional inpatient evaluation and treatment. After an additional three months of treatment and evaluation, the staff was still divided. On December 12, 2005, after more than foui’teen months of treatment and evaluation, the mental health personnel at the State Hospital unanimously decided that Prater was competent to stand trial.
 

 ¶ 7. On August 1, 2006, Prater was tried for capital murder. On August 3, 2006, Prater was found guilty and sentenced to life imprisonment in the custody of the MDOC without the possibility of parole. On an ore tenus motion, Prater requested additional time to file all post-trial motions. On September 7, 2006, the trial court granted Prater additional time to file an out-of-time motion for a judgment notwithstanding the verdict (JNOV) or, alternatively, a new trial motion. In addition, because Prater’s trial counsel had been suspended from the practice of law, the trial court appointed new counsel to represent Prater in perfecting his case on appeal. The trial court directed the court reporter to produce transcripts of all motion hearings and the trial to the new defense counsel on or before February 28, 2007. On March 7, 2008, Prater filed a motion for a JNOV or, alternatively, new trial. On March 10, 2008, the trial court denied Prater’s motion for JNOV or, in the alternative, a new trial. Feeling aggrieved, Prater appeals his conviction and sentence.
 

 DISCUSSION
 

 I. Exclusion of Defense Witness
 

 ¶ 8. On the morning of trial, the State was given a list of seven witnesses by the defense. That list contained two witnesses about whom the prosecution had no prior knowledge. Tommy Scales, one of the two unknown witnesses, was to be called as an alibi witness. The trial court held a hearing on the failure to timely disclose the witness list. At the conclusion of the hearing, the trial court ruled that because the defense had failed to abide by the rules of discovery and provide Scales’s name to the State in a timely manner prior to trial, Scales would not be allowed to testify. The trial court held that defense counsel’s non-disclosure of Scales as an alibi witness was intentional and done with an intent to obtain a tactical advantage.
 

 ¶ 9. Prater claims that Scales’s name was not given prior to trial because his defense counsel had just learned about Scales a few days before trial and discovery was supplemented as soon as possible. Prater asserts that the State cannot claim that it was prejudiced or surprised by an alibi witness because there were other wit
 
 *889
 
 nesses who could be considered as possible alibi witnesses. The State asserts that Prater was aware of Scales’s existence as an alibi witness prior to trial because Scales recounted details of the murder to Jackie Bolton, an investigator who began working for the defense counsel shortly after the murder. The State contends that it was prejudiced by the lack of disclosure because had Scales’s name been timely disclosed, the State would have had sufficient time to make an effort to conclusively determine the veracity of the testimony of the witness.
 

 ¶ 10. “In reviewing rulings of a trial court regarding matters of evidence, relevancy and discovery violations, the standard of review is abuse of discretion.”
 
 Sims v. State,
 
 928 So.2d 984, 986(¶ 8) (Miss.Ct.App.2006).
 

 ¶ 11. According to Uniform Rule of Circuit and County Court 9.05, if, prior to or during trial, a party learns of an additional witness and fails to timely disclose that information to the opposing party, the court may either (1) grant a continuance; (2) limit further discovery of the party who failed to comply; (3) find the attorney who failed to comply in contempt; or (4) exclude the testimony of the undisclosed witness. The supreme comb has held that:
 

 [ I]f the trial court finds that the omission [of notice of an alibi witness] was willful and motivated by a desire to obtain a tactical advantage that would minimize the effectiveness of cross-examination and the ability to adduce rebuttal evidence, it would be entirely consistent with the purposes of the Compulsory Process Clause to simply exclude the witnesses] testimony.
 

 Coleman v. State,
 
 749 So.2d 1003, 1009(¶ 15) (Miss.1999) (internal quotations omitted).
 

 ¶ 12. In the case at bar, the trial court held an evidentiary hearing outside the presence of the jury. During this hearing, defense counsel made a proffer of Scales’s testimony. Scales testified that he saw Prater at approximately 8:00 a.m. on August 3, 2006, getting off the bus at the Discovery House and later between 10:00 a.m. and 10:30 a.m. in the parking lot of the Discovery House. Scales also testified that he recalled disclosing this information to Bolton five or six years prior to trial. After hearing Scales’s testimony and arguments from the attorneys, the trial court reviewed the court file and found that Scales was served by Bolton with a subpoena on July 28, 2006. The subpoena was returned and marked filed by the clerk on July 31, 2006. The trial court ruled that the defense counsel had knowledge of this alibi witness through his employee and that the failure to timely disclose the witness list was willful and an attempt to give the defense a tactical advantage over the State.
 

 ¶ 13. Because Prater did not properly disclose the witness to the State, the trial court did not abuse its discretion in excluding Scales as an alibi witness. Therefore, this assignment of error is without merit.
 

 II. Ineffective Assistance of Counsel
 

 ¶ 14. Prater alleges that his defense counsel was ineffective because: (1) he failed to timely disclose two witnesses resulting in the court’s exclusion of Scales as an alibi witness; (2) he failed to interview available witnesses or investigate the physical aspects of the case; and (3) he was unfamiliar with the quality and substance of his investigator’s work. Prater claims he was prejudiced by his counsel’s deficient performance because Scales’s testimony would have impeached the credibility of the State’s key witness, Riley, and supported the challenge to his alleged confession. The State contends that the dis
 
 *890
 
 closure of witnesses at the time of trial was a strategic decision and did not constitute a deficient performance. The State claims that on previous occasions both the defense counsel and the State had overlooked discovery violations of this nature as a professional courtesy. Also, the State asserts that Prater has failed to show that the alleged deficiency prejudiced his defense.
 

 ¶ 15. “The Mississippi Supreme Court has stated that, where the record cannot support an ineffective assistance of counsel claim on direct appeal, the appropriate conclusion is to deny relief, preserving the defendant’s right to argue the same issue through a petition for post-conviction relief.”
 
 Wilcher v. State,
 
 863 So.2d 776, 825 (¶ 171) (Miss.2003). This issue will not be addressed on direct appeal because the record is incomplete to decide Prater’s argument of ineffective assistance of counsel. Prater may raise this argument in a timely filed and appropriate post-conviction relief proceeding, if he so chooses.
 

 III. Inflammatory Closing Argument
 

 ¶ 16. During its closing argument, the prosecutor made the following statements:
 

 Statement 1:
 

 And you’re told, ladies and gentlemen, one of the first things, that-and I find this so disingenuous, you’re told that, ladies and gentlemen, that people get convicted of crimes that they didn’t commit. And I’ve had those. I’ve had those. I tried a woman in Columbus for killing her baby. The case got appealed to Supreme Court. The Supreme Court refused to allow some of the evidence that was introduced in the first trial in at a second trial. The second jury never got to hear that evidence and they found her not guilty. Does that mean that she is subjectively] not guilty. No, it doesn’t. What it means is, that the second jury didn’t hear the same case the first jury did.
 

 Statement 2:
 

 We have long held in the law that [a] man’s home is his castle. The one refuge you have from the world that we spoke of, ladies and gentlemen. And on August 20, 2001, [the] castle was breached and [the owner] slaughtered and pillage fall [sic] on its heels. And which of us can say we’re immuned [sic] from that? This Defendant has admitted that he had a hand in that horror, that means something. And now the question becomes, whatever [sic] are you going to do about it? You take the jury instructions, you find the facts, that’s your job. And what all [sic] the State of Mississippi ask[s] of you is justice that’s all. Nothing more and I hope nothing less.
 

 ¶ 17. Prater asserts that both statements were inflammatory; thus, he argues that he was denied a fair trial. Prater argues that the State’s reference to another case and to the appellate process in closing argument in the first statement violated the rule recognized in
 
 Wiley,
 
 which held that “a prosecutor’s argument which informed the jury that their verdict was subject to a right of appeal” is reversible error.
 
 Wiley v. State,
 
 449 So.2d 756, 762 (Miss.1984) (citing
 
 Howell v. State,
 
 411 So.2d 772, 776 (Miss.1982)). Prater contends that the State’s second statement constituted a forbidden send-a-message argument condemned by the supreme court in
 
 Payton v. State,
 
 785 So.2d 267, 270(¶ 11) (Miss.1998).
 

 ¶ 18. “In general, the failure to object to the prosecution’s statements in closing arguments constitutes a procedural bar.”
 
 Ross v. State,
 
 954 So.2d 968, 1001(¶ 71) (Miss.2007). There is no indication in the record that Prater objected to either comment. Because Prater failed to object to the prosecution’s comments during closing
 
 *891
 
 argument, we find that this issue is procedurally barred.
 

 IV. Opinion Testimony Regarding Canine Olfactory Evidence
 

 ¶ 19. Paulette Weibel, a canine handler with Search Dog South, a nonprofit organization which looks for lost and missing people, testified that her bloodhound Hadley was able to trace Hudson from a trailer at Landers Trailer Park to the carport door at the Millers’ home. Weibel stated that a scent inventory confirmed that Hudson had been at the Millers’ home.
 

 ¶ 20. Prater objected to Weibel’s testimony, but the trial court denied the objection. He claimed a proper foundation had not been laid to establish Weibel as an expert in dog training or scent. Prater argues that Weibel did not mention any AKC registration or other appropriate certification to prove Hadley’s competency and reliability in scent inventory or any criminal investigative work performed by Hadley that was presented in court. Prater also argues that Weibel did not mention any prior experience she has had testifying in court.
 

 ¶ 21. In
 
 Hudson v. State,
 
 977 So.2d 344, 350 (¶¶ 30-31) (Miss.Ct.App.2007), Hudson argued that dog-tracking evidence was generally too unreliable to be admissible and that one hundred years of Mississippi case law should not be followed. This Court ruled that the qualifications of tracking dogs and handlers have been well documented at trial. Weibel testified in
 
 Hudson
 
 that Hadley, who was a purebred bloodhound and had performed two searches, was trained by the North American Search Dog Network.
 
 Id.
 

 ¶ 22. In this case, Weibel testified that she completes about seventy missions a year, which include locating missing people and performing cadaver work and gun detection. Weibel stated that Hadley began performing puppy run-away training at nine months. Puppy run-away training is the first method to teach dogs like Hadley scent discrimination. Thereafter, Hadley’s scent training became more complex when the handlers laid scents using unknown individuals, and then the handlers had the dog locate the person. Hadley trains eight to ten hours per week. Weibel also stated that Hadley is well trained and reliable. In 2001, Hadley passed her required evaluations, and the dog had completed close to 200 missions. Weibel testified that she had attended numerous seminars to receive instructions on how to handle Had-ley, and she has worked along side Hadley in her training since 1994.
 

 ¶ 23. This Court has previously upheld the admissibility of opinion testimony about canine olfactory evidence involving the same bloodhound and handler in
 
 Hudson.
 
 There is no case law to refute this ruling since
 
 Hudson.
 
 We find that both Weibel and Hadley have sufficient training and certification in olfactory inventory. Accordingly, we find that the trial court did not err in admitting the canine olfactory evidence at trial. Therefore, this issue is without merit.
 

 V. Lesser-included-offense Instruction
 

 ¶ 24. During the jury instructions conference, the defense counsel made a verbal request for a lesser-ineluded burglary instruction. The trial judge refused the instruction stating that there was nothing in the evidence that would warrant a lesser-included-offense instruction.
 

 ¶ 25. Prater contends that the lesser-ineluded burglary instruction should have been given because counsel requested the instruction, and a factual basis existed for the instruction. Prater claims that Riley’s
 
 *892
 
 testimony that he thought Hudson went back into the house to kill the old lady and burn the house down was sufficient to show an arguable separation between the arson and burglary. Prater contends that Riley’s testimony creates the possibility that Miller was not murdered until the fires were set and not during the burglary.
 

 ¶ 26. The State contends that a burglary instruction would have been an incorrect application of the law and an instruction given without a rational eviden-tiary basis. The State asserts that Prater presented no credible evidence that he had participated in a burglary and then later absented himself from the Millers’ home before the victim was murdered. “[T]he accused is entitled to have the jury instructed that it may consider convicting him of a lesser offense only where there is in the record an evidentiary basis therefor.”
 
 Doss v. State,
 
 709 So.2d 369, 377(¶ 16) (Miss.1996).
 

 ¶ 27. This Court held in
 
 Scarborough v. State,
 
 956 So.2d 382, 386(¶ 21) (Miss.Ct.App.2007) that:
 

 One who ... aids and abets necessarily enters into an agreement that an unlawful act will be done. He participates in the design of the felony. In
 
 Crawford v. State,
 
 133 Miss. 147, 151, 97 So. 534, 534 (1923), our supreme court ruled that in order to be held criminally liable as an aider and abetter in the commission of a felony, one must do something that will incite, encourage, or assist the actual perpetrator in the commission of the crime. And it has been further stated that [i]f two or more persons enter into a combination or confederation to accomplish some unlawful object, any act done by any of the participants in pursuance of the original plan and with reference to the common object is, in contemplation of law, the act of all. As such, a person who participates in the design and plan of committing an unlawful act which is then carried out can be found guilty as a principal under either the theory of conspiracy or the theory of aiding and abetting.
 

 (Internal citations and quotations omitted).
 

 ¶ 28. Prater was not entitled to a burglary instruction. In this case, the jury was charged with finding Prater guilty as a principal of capital murder if it found beyond a reasonable doubt that Prater did aid, assist, or encourage another or others in the crime by either entering the Millers’ home and participating in the acts therein or by acting as the lookout while a robbery took place. In a statement to the Stark-ville Police Department, Prater stated that he agreed to be the “lookout” for the group of men on the corner while they broke into the Millers’ home. Further Prater stated that when two of the men came out of the house, they had blood on them. Even as the alleged “lookout” person, Prater agreed to assist the men in carrying out an unlawful act. At some point during the robbery and the arson, Miller was assaulted and later died. The record does not reflect any factual or rational evidentiary basis for a burglary charge. Therefore, we find that this issue is without merit.
 

 VI. Weight of the Evidence
 

 ¶ 29. Prater was tried and convicted of capital murder and sentenced to life in the custody of MDOC without the possibility of parole. Prater claims that the trial court erred in denying his motion for a new trial because the verdict was contrary to the weight of the evidence. Prater acknowledges that he participated in the robbery, but he alleges that there is no evidence to support the murder conviction. Prater argues that the murder and burglary were separate transactions. The State asserts that if the evidence is taken in the
 
 *893
 
 light most favorable to the verdict, then this Court must assume that Riley’s testimony was an accurate account of the events and shows that each of the men conspired to rob the victim and executed the assigned task.
 

 ¶ 30. This Court’s “standard of review for a post-trial motion is abuse of discretion.”
 
 Howell v. State,
 
 860 So.2d 704, 764 (¶ 212) (Miss.2003). The supreme court has stated that:
 

 In determining whether a jury verdict is against the overwhelming weight of the evidence, this Court must accept as true the evidence which supports the verdict. A new trial is the proper remedy in those instances where the verdict is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice.
 

 Seeling v. State,
 
 844 So.2d 439, 443 (¶¶ 8-9) (Miss.2003).
 

 ¶ 31. The evidence showed that the men: entered the Millers’ home, took cash and other personal belongings, assaulted Miller and set fires in six different locations in the Millers’ home; and Miller died as a result of the injuries she received during the attack. The jury gave credence to Riley’s testimony that he saw Prater and his partners in crime enter the Millers’ home, leave the home, divide their loot, and then scatter. Riley also testified that he saw Hudson re-enter the Millers’ home; thereafter, Riley saw smoke emitting from the Millers’ home after Hudson left the Millers’ home the second time. In Prater’s statements to the authorities, he acknowledged that he was the lookout man for the others while they robbed Miller, and that he observed blood on Hudson and Williams when they left the Millers’ home. Looking at the totality of the facts and circumstances, we do not find that allowing the verdict to stand would sanction an unconscionable injustice. Accordingly, we find that this assignment of error is without merit.
 

 VII. Suppression of Statements
 

 ¶ 32. On February 19, 2002, Prater made statements to the Starkville Police Department and the Oktibbeha County Sheriffs Department regarding his involvement in the offenses against Miller. At trial, Prater filed a motion to have those statements suppressed. The trial court denied Prater’s request. On appeal, Prater argues that the trial court erred in denying his motion to suppress the statements.
 

 ¶ 33. Prater asserts that because he neither understood the complex information involved in his interrogation nor what the police read to him because of his history of mental illness and illiteracy, his statements were not freely and voluntarily given. Prater also claims that the police coerced him into signing a waiver of his rights and confessing that he had committed the crimes for which he was indicted. He also claims that the police failed to stop his interrogation when he requested they do so. The State asserts that Prater testified during the suppression hearing that he understood his rights.
 

 ¶ 34. “A statement by the accused is admissible if the accused was given the
 
 Miranda
 
 warnings, and then knowingly, intelligently and voluntarily waived the rights.”
 
 Busick v. State,
 
 906 So.2d 846, 855(¶ 16) (Miss.Ct.App.2005). “The voluntariness of a waiver, or of a confession, is a factual inquiry that must be determined by the trial judge from the totality of the circumstances.”
 
 Hicks v. State,
 
 812 So.2d 179, 191(¶ 32) (Miss.2002). The trial court in
 
 Morris v. State,
 
 798 So.2d 603, 606(¶ 9) (Miss.Ct.App.2001) held that:
 

 
 *894
 
 When a defendant challenges the volun-tariness of his statement, the trial court must hold an evidentiary hearing outside the jury’s presence to determine the admissibility of the confession. The State must prove the voluntariness of the statement beyond a reasonable doubt. The State establishes a prima facie case of voluntariness when the officer, or other person having knowledge of the facts, testifies that the confession was voluntarily made without any threats, coercion or offer of reward. When the State establishes its prima facie case of volun-tariness, the defendant must then rebut the State’s assertion of voluntariness.
 

 (Internal citations and quotations omitted).
 

 ¶ 35. The judge sitting as the finder of fact is tasked with the responsibility of determining beyond a reasonable doubt whether “the defendant’s statement was freely and voluntarily given, and was not the result of force, threat or intimidation.”
 
 Baldwin v. State,
 
 757 So.2d 227, 234-35(¶ 28) (Miss.2000). “[T]he mental abilities of an accused are but
 
 one
 
 factor to be considered in determining whether the confession was knowingly, intelligently and voluntarily made.”
 
 McGowan v. State,
 
 706 So.2d 231, 235(¶ 12) (Miss.1997). This Court cannot disturb the trial court’s determination that Prater’s confession was admissible “unless the trial court committed manifest error, applied an incorrect legal standard, or the decision was contrary to the overwhelming weight of the evidence.”
 
 Morris,
 
 798 So.2d at 606(¶ 8).
 

 ¶ 36. The trial court held a hearing outside the presence of the jury on Prater’s motion to suppress his statements to the Starkville Police Department and the Oktibbeha County Sheriffs Department. The trial judge heard testimony from Officer Bill Lott of the Starkville Police Department, Prater, Sheriff Dolph Bryant, and Detective William Durr of the Stark-ville Police Department. The trial judge concluded that there was sufficient evidence to conclude that Prater’s statements were freely and voluntarily given. We find that there is no evidence to suggest that the trial court abused its discretion in making this determination. This issue is without merit.
 

 VIII. Mental Competency
 

 ¶ 37. After fourteen months of mental health treatment and evaluation, Drs. McMichael, Montgomery, Gilbert S. Macvaugh, III, and Criss Lott, unanimously decided that Prater was competent to stand trial. Prater asserts that the trial court erred in ruling that he was competent to stand trial. Prater claims that his history of mental illness, mental retardation, low IQ, functional illiteracy, and consumption of various medications for his physical and mental conditions demonstrate that he lacked the mental competency to stand trial.
 

 ¶ 38. The supreme court held in
 
 Billiot v. State,
 
 655 So.2d 1, 11 (Miss.1995) that:
 

 When the trial court has made a finding that the evidence does not show a probability that the defendant is incapable of making a rational defense, we will not overturn that finding unless we can say, from the evidence, that the finding was manifestly against the overwhelming weight of the evidence. The evidence must show more than a possibility that defendant is incompetent to stand trial — the evidence must go further until it appears to the trial court that there is a probability that defendant is incapable of making a rational defense. In this initial inquiry, the trial judge must weigh the evidence and be the trier of facts.
 

 ¶ 39. On April 5, 2006, the trial court conducted a hearing to evaluate Prater’s present competency. During that hearing
 
 *895
 
 the trial court heard testimony from Dr. McMichael, a medical doctor who specialized in psychiatry and was the Service Chief of Forensic Services for the Mississippi State Hospital at Whitfield; Dr. Lott, a clinical psychologist and clinical director at St. Dominic Hospital outpatient clinic and a consultant with the Mississippi State Hospital Forensic Services; and Dr. Mae-vaugh, a clinical psychologist and practicing psychologist at the Mississippi State Hospital. Based on the testimony and previous reports that the court received, the trial judge concluded that Prater was presently competent to stand trial. In their report dated November 30, 2005, the treating doctors were of the opinion that Prater is mildly mentally retarded and is no longer exaggerating or malingering his intellectual deficits. Having found Prater mentally competent, the trial judge scheduled the case for trial. Therefore, Prater’s argument is without merit.
 

 CONCLUSION
 

 ¶ 40. We find that Prater’s assignments of error are without merit. Therefore, Prater’s conviction and sentence are affirmed.
 

 ¶ 41. THE JUDGMENT OF THE CIRCUIT COURT OF OKTIBBEHA COUNTY OF CONVICTION OF CAPITAL MURDER AND SENTENCE OF LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS WITHOUT THE POSSIBILITY OF PAROLE IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO OKTIBBEHA COUNTY.
 

 LEE AND MYERS, P.JJ., IRVING, GRIFFIS, BARNES, ISHEE, ROBERTS, CARLTON AND MAXWELL, JJ., CONCUR.
 

 [1]
 

 . The record does not contain any further information regarding Little Mark’s true identity.
 

 [2]
 

 . The record does not contain any further information regarding Joshua Williams beyond Prater’s written statement.